

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RCH:PP
F. #2021R00894

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 2, 2023

<u>By ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Krystle Burrell
      <u>Criminal Docket Nos. 22-195; 23-207 (KAM)</u>

Dear Judge Matsumoto:

   The government respectfully submits this letter in advance of defendant Krystle Burrell's sentencing hearing, which is scheduled for November 10, 2023.[1] For the reasons set forth below, the government respectfully request that the Court impose a sentence of 37 months' imprisonment in the bribery case (22-CR-195) to run consecutive to 8 months' imprisonment in the contraband smuggling case (23-CR-207).[2]

---

[1] The defendant was originally scheduled to be sentenced for her bribery offense (22-CR-195) on May 3, 2023. On March 13, 2023, the government submitted a sentencing memorandum (ECF No. 50), requesting that the Court impose a Guidelines sentence between 30 to 37 months' imprisonment. However, as set forth in more detail below, the defendant was subsequently arrested on March 29, 2023, because she committed a new crime prior to her sentencing. This sentencing letter supersedes the government's prior submission.

[2] The government stated in its request to relate the two cases that the parties would request the Court sentence the defendant on both cases simultaneously. After reviewing the Presentence Investigation Report, the government has reassessed its position and respectfully requests that the Court sentence the defendant on the different cases in different proceedings on the same day. As an initial matter, the government did not appreciate that sentencing the defendant in a consolidated proceeding in two separate cases would require a grouping analysis under the Guidelines, effectively resulting in no additional punishment under the Guidelines for the defendant's serious offense while on pretrial release. Second, and most

I.      Background

    A. The Bribery Offense

In approximately October 2021, law enforcement began investigating a scheme that involved bribes being paid to New York City Department of Correction ("DOC") correction officers in exchange for the officers smuggling drugs and other contraband into DOC facilities located on Rikers Island. See Presentence Investigation Report ("PSR") ¶ 5.[3] As part of the investigation, law enforcement agents reviewed recorded calls made by inmates using the DOC's telephone system, financial records and surveillance video. See id.

The defendant, a correction officer on Rikers Island, received bribes from Terrae Hinds, a Bloods gang member incarcerated at Rikers Island and the defendant's romantic partner. At the time of the offense conduct in this case, Hinds was awaiting trial in New York Supreme Court on a gun possession charge in connection with a shooting.[4] Beginning in approximately June 2021, the defendant smuggled at least two contraband cell phones to Hinds while he was incarcerated at the facility where she worked. Id. ¶¶ 8-10. In addition to smuggling contraband into Rikers Island, the defendant accepted money from other Rikers Island inmates to whom Hinds sold contraband to further Hinds' distribution of narcotics and other contraband items at his facility. Records obtained from Cash App and Zelle show that, between June 4, 2021 and July 23, 2021, the defendant received at least $9,780 on her Cash App and Zelle accounts related to Hinds and/or his contraband business. On numerous other occasions, inmates attempted to send money to the defendant but the payment transfer applications blocked the transactions. As an example, on July 9, 2021, Hinds called another inmate in his facility ("Inmate 1"). During the call, Inmate 1 told Hinds

---

importantly, as noted below there is a split among the Courts of Appeals on whether acceptance of responsibility points can be awarded on one count of conviction and not another count in a consolidated sentencing proceeding, and the Second Circuit does not appear to have decided this issue. Accordingly, because the defendant is being sentenced on two separate dockets, and to avoid the Court having to decide this issue, the government respectfully requests that the Court sentence the defendant in each case in a separate proceeding held on the same day. The Probation Department has informed the government that it requests the sentencing be held in one proceeding. The defendant agrees with the Probation Department that the sentencing should be held in one proceeding.

    [3] All citations to the PSR are to the Revised Presentence Investigation Report dated August 11, 2023.

    [4] Hinds subsequently pleaded guilty to attempted criminal possession of a weapon and received 3 years' imprisonment. At the time of his incarceration and relationship with the defendant, Hinds already had more than 10 criminal convictions.

that Inmate 1 was about to send Hinds "eight."  Inmate 1 then asked if Hinds would "do something up top for me."  Hinds stated that he would give Inmate 1 "two packs next week" if he received "a quarter of a page right now."[5]  That same day, an individual attempted to send $800 to the defendant's Cash App account but the transactions were blocked by Cash App.  The subject line of the transactions listed the nickname of Inmate 1.  Id. ¶¶ 12-19.

The defendant even had direct communication with other inmates to facilitate this contraband smuggling business.  For example, on June 3, 2021, the defendant received a call from Inmate 1.  Inmate 1 asked the defendant for her Cash App account so he could send her money.  The defendant then provided Inmate 1 with her account, and Inmate 1 told the defendant that he would send $800.  Subsequently, Inmate 1 called the defendant again and asked her to request $800 through Zelle because the Cash App transaction was unsuccessful.  Later that day, a known associate of Inmate 1 sent the defendant $800 through Zelle.  On June 4, 2021, the defendant, Hinds, and Inmate 1 had a three-way phone call during which Inmate 1 told Hinds he sent the "rest through Cash App."  Hinds asked the defendant if she received the money, and the defendant confirmed.  Hinds then directed Inmate 1 to "come up," meaning, that Inmate 1 should come to Hinds' housing area to receive the contraband.  Later that day, in a separate phone call, the defendant complained to Hinds about the people he was "dealing with" because they sent money to the defendant through a method that had her "home number" and "email," indicating that the defendant wanted to conceal that she was receiving payments for contraband on behalf of Hinds.  Id. ¶ 17.

In July 2021, shortly after beginning her scheme with Hinds, law enforcement conducted a voluntary interview of the defendant.  The defendant initially denied smuggling a cell phone into Rikers Island, but later falsely stated she did smuggle a phone on one occasion because she had been threatened.  Notably, the defendant also stated she had never received phone calls from incarcerated individuals despite receiving hundreds of calls from Hinds.  After this interview, the defendant was suspended for 30 days and then placed on modified duty, preventing her from having any further in person contact with Hinds or other inmates.  Id. ¶ 11.  Despite this, the defendant continued to communicate with Hinds.  First, she assisted with organizing Hinds' family to pay his bail and secure his release from Rikers Island.  Second, after Hinds' release, the defendant continued to assist Hinds with his illegal activities, including appearing to arrange for another correction officer to work for an inmate associated with Hinds.  Id. ¶ 19.

As the defendant admits, she was in an "inappropriate and unlawful romantic relationship" with Hinds.  Def.'s First Sentencing Mem. at 1.  On June 25, 2021, the defendant and Hinds said, "I love you" to each other and they mimicked a kiss over the phone.  On October 17, 2021, the defendant and Hinds discussed their sexual relationship.  In

---

[5] A "page" refers to a sheet of paper soaked with liquid K2, a synthetic cannabinoid that is contraband at Rikers Island.

another call, the defendant stated that "nobody f***ing touch me since July," which is when the defendant was suspended by DOC.  Id. at ¶¶ 20-21.

On April 5, 2022, the defendant was arrested on a complaint authorized by the Honorable Vera M. Scanlon, charging her with conspiracy to violate the Travel Act. Subsequently, a grand jury sitting in the Eastern District of New York returned an indictment, charging the defendant and Hinds with conspiracy to commit federal program bribery, federal program bribery, and conspiracy to violate the Travel Act by committing bribery in violation of New York State law.  On September 20, 2022, the defendant pleaded guilty before the Court to Count Three of the Indictment, which charged the defendant with federal program bribery, in violation of 18 U.S.C. § 666(a)(l)(B).

### B. The Contraband Smuggling Offense

During the pendency of her bribery case, the defendant conspired with Hinds and others to smuggle contraband, including marijuana and cigarettes, into the Metropolitan Detention Center (the "MDC") where Hinds was detained.  On July 29, 2022, after her arrest on federal charges but prior to her pleading guilty, the defendant and an unknown male (the "Unknown Male") entered the New York State Supreme Court building at 100 Centre Street and proceeded to the 15th floor, where Hinds had a court appearance related to his gun possession case. The Unknown Male entered a bathroom on that floor on multiple occasions. The defendant then attended Hinds' court appearance on that floor. After this court appearance, Hinds attempted to convince law enforcement to let him use this public bathroom on the 15th floor; New York County District Attorney investigators refused to let Hinds use that bathroom but later searched the bathroom and located three balloons of marijuana hidden in a bathroom stall.[6]  Id. ¶ 25.

On November 21, 2022, after the defendant pleaded guilty before this Court, MDC staff confiscated a Samsung cell phone (the "Contraband Samsung Phone") from Hinds' cell at MDC.  On February 27, 2023, the Honorable James L. Cott, United States

---

[6] In its original sentencing submission, the government notified the Court about this incident and wrote that "the government is not seeking to prove that the defendant attempted to smuggle these narcotics to Hinds, but this incident – months after her federal arrest – demonstrates that the defendant continued to associate with and support Hinds even as he continued to attempt to commit crimes while in federal custody."  Gov't First Sentencing Mem. at 7.  However, after filing this original sentencing submission, the government discovered the communications between the defendant and Hinds about the contraband smuggling scheme discussed below.  The defendant has now pleaded guilty to conspiring to smuggle contraband to Hinds between June 2022 and November 2022.  Thus, the defendant was not merely continuing to associate with her criminal partner but violated federal and state law by conspiring to smuggle contraband to Hinds at the MDC by passing it to him at a courthouse.

4

Magistrate Judge for the Southern District of New York, issued a warrant, permitting law enforcement to search the Contraband Samsung Phone for evidence of various federal offenses, including 18 U.S.C. §§ 371 and 1791 (possession of contraband inside a prison and conspiracy).

A review of the Contraband Samsung Phone showed that the defendant and Hinds communicated on WhatsApp in furtherance of the smuggling conspiracy and that the defendant assisted in smuggling in marijuana and other contraband to Hinds at the MDC so that Hinds could resell it for a profit. On November 15, 2022, at 4:50 p.m., Hinds wrote to the defendant in a WhatsApp text message, "The jet said he give us a ride for 5 bands. Said we can put a pound 2 cartons and a bottle and sneakers," meaning that another member of Hinds' gang had arranged with a correction officer to smuggle in one pound of marijuana, two cartons of cigarettes, a bottle of alcohol, and sneakers for $5,000. Hinds then discussed the price he could sell the contraband for, including that he could receive $35,000 for selling the marijuana. Id. ¶ 27.

After Hinds negotiated with another individual to buy the marijuana, the defendant and Hinds discussed how they would get the $5,000 to smuggle in the contraband. The defendant said she had "2," meaning $2,000 for Hinds. That evening, at Hinds' instruction, Burrell rented one of her vehicles to another individual in exchange for marijuana and money. Burrell then delivered money and marijuana to an address provided by Hinds. As this occurred, Hinds was messaging with another inmate at MDC also using a contraband phone (Co-Conspirator-1), regarding the transaction, including whether Hinds' outside contact (the defendant) was almost at the drop location. Id. ¶¶ 28-32.

At 11:38 p.m., Co-Conspirator 1 wrote to Hinds complaining about the quality of the marijuana and later relayed that his contact did not want this marijuana. Hinds responded, "that's not for him jet aren't we selling that," consistent with the other messages showing the plan was to smuggle this marijuana to sell it within MDC. Co-Conspirator 1 eventually told Hinds that if he could get him the $5,000, then Co-Conspirator 1 will provide a higher quality marijuana to be smuggled into MDC. Co-Conspirator 1 provided Hinds with an address on 126th Street in Manhattan, and Hinds gave that address to the defendant. At 2:11 a.m., the defendant made the drop at the location. Id. ¶¶ 33-37.

At 1:16 p.m. that day, Hinds wrote to the defendant "[good morning] b[a]by. Touchdown babe," meaning the delivery of contraband was a success. Later that evening, an individual used Hinds' Contraband Samsung Phone to write to the defendant: "Tso [Hinds' nickname] had went to medical earlier and I had the phone but when he got back we was locked in and I couldn't get it to him. He said he love you and he got everything he was supposed to. He said everything swagged out," again reiterating that the operation was successful. Id. ¶ 38.

On March 29, 2023, the defendant was arrested on a complaint authorized by the Honorable Robert M. Levy. The defendant has been detained at the MDC since her

5

arrest. On May 23, 2023, the defendant waived indictment and pleaded guilty to an Information charging her with providing and possessing contraband in prison, in violation of 18 U.S.C. § 1791(a)(1) and (b)(3).

II.     Guidelines Calculation

The government submits that the following Guidelines range should apply:

Bribery – 22-CR-195

| | |
|---|---:|
| Base Offense Level (§ 2C1.1(a)(1))) | 14 |
| Plus: More than One Bribe (§ 2C1.1(b)(1)) | +2 |
| Plus: More than $6,500 in Bribes (§ 2B1.1(b)(1)(C)) | +2 |
| Plus: Public Official in Sensitive Position (§ 2C1.1(b)(3)) | +4 |
| Total: | **22** |

Contraband Smuggling – 23-CR-207

| | |
|---|---:|
| Base Offense Level (§§ 2P1.2(c)(1), 2D1.1(a)(5), 2D1.1(c)(17)) | 6 |
| Plus: Distribution of Controlled Substance in Prison (§ 2D1.1(b)(4)) | +2 |
| Plus: Offense Committed While on Pretrial Release (§ 3C1.3) | +3 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | -2 |
| Total: | **9** |

Because the total offense level of the contraband smuggling offense is more than 9 levels lower than the bribery offense, the contraband smuggling group is disregarded in the grouping analysis and the total offense level for both counts is 22. U.S.S.G. § 3D1.4(c). In addition, pursuant to U.S.S.G. § 4C1.1 of the 2023 Guidelines amendments, the defendant is entitled to a two-point reduction in her total offense level because she has zero criminal history points and satisfies other criteria, yielding a total offense level of 20. Based on a Criminal History Category of I, the Sentencing Guidelines calculate a range of imprisonment of 33 to 41 months.[7]

---

[7] If the Court decides that the defendant should be sentenced in two separate proceedings, the defendant's offense level of 9 for the contraband smuggling offense will result in a Guidelines range of 6-12 months' imprisonment because the Court's sentence in

6

The government's calculation of the Guidelines is the same as the Probation Department's except that the Probation Department calculated that the defendant should not receive a reduction for acceptance of responsibility. The government submits that the defendant should receive a reduction for acceptance of responsibility on her contraband smuggling case but not on her bribery case. As an initial matter, the defendant should not be entitled to any reduction for acceptance of responsibility on the bribery case because she committed a new federal crime while on pretrial release, violated the terms of her bond by doing so and continued her pattern of introducing contraband into a jail facility so that Hinds could resell it as she did when she accepted bribes as a correction officer. See United States v. Fernandez, 127 F.3d 277, 285 (2d Cir. 1997) (holding that a district court has discretion on whether defendant has accepted responsibility and that "[o]ne factor that the sentencing court may take into account in deciding whether a defendant has accepted responsibility is whether he has voluntarily terminated all criminal conduct"; "If a defendant commits a second crime after pleading guilty to, and while awaiting sentencing for, a first offense, that is a relevant consideration in denying the acceptance-of-responsibility adjustment in selecting the sentence for that first offense [because] [t]he second crime refutes the disavowal of future criminal activity implied by the guilty plea to the first crime.") (citations and internal quotation marks omitted); United States v. Maxwell, 75 F. App'x 436, 438 (6th Cir. 2003) (affirming denial of acceptance of responsibility when the defendant possessed methamphetamine for resale pending sentencing for possession with intent to distribute methamphetamine).

Second, and even assuming the Court disagrees with the government that the sentencings should not be consolidated, the government submits that acceptance of responsibility can be adjudicated on a case by case (or count by count) basis. Although some courts have held that acceptance of responsibility is an "all-or-nothing" approach, see United States v. Thomas, 242 F.3d 1028, 1034 (11th Cir. 2001), United States v. Salabarria, No. 21-3002, 2021 WL 5712151, at *3 (6th Cir. Dec. 2, 2021), other courts have held that "the guidelines do not mandate an 'all or nothing' approach" to acceptance of responsibility." United States v. Wattree, 431 F.3d 618, 622 (8th Cir. 2005). In Wattree, although the Eighth Circuit reversed a district court granting the acceptance of responsibility reduction on counts the defendant pled guilty to but not granting the acceptance of responsibility reduction on the counts the defendant proceeded to trial on based on the facts of the case, the Court held that the district court was correct to consider a "totality of the circumstances" approach to whether the defendant accepted responsibility on the counts he pled guilty to. Similarly, in United States v. Williams, 344 F.3d 365 (3d Cir. 2003), the Third Circuit affirmed a district court granting acceptance of responsibility points as to one count a defendant pled guilty to and not another count he proceeded to trial on because the counts did not group together. Id. at 379. As in Williams, the counts here do not group together, and therefore, the Court

---

the bribery case will place the defendant in Criminal History Category II. The Guidelines range for the bribery offense will remain the same at 33 to 41 months' imprisonment.

should consider the acceptance of responsibility separately as to the bribery and the contraband smuggling. The government is unaware of any Second Circuit case law relevant to this precise issue.

The defendant argues that she should receive acceptance of responsibility on both cases because she pleaded guilty in both cases and has not contested the charges. The fact that the defendant pleaded guilty to the bribery offense does not mean she "is [] entitled to an adjustment . . . as a matter of right," because a defendant's "voluntary termination or withdrawal from criminal conduct or associations" is another factor for the Court to consider. U.S.S.G. § 3E1.1 Application Note 1. As the Second Circuit noted in Fernandez, and as many other courts have concurred with, the fact that the defendant continued to commit crimes after pleading guilty "refutes the disavowal of future criminal activity implied by the guilty plea to the first crime." 127 F.3d at 285 (citation and internal quotation marks omitted). The fact that the defendant here committed essentially the same crime (introducing contraband into a jail facility for resale), with the same co-conspirator, after having pleaded guilty to accepting bribes as a government official demonstrates that she did not actually cease criminal conduct or accept responsibility for her actions. See United States v. Chu, 714 F.3d 742, 748 (2d Cir. 2013) (affirming district court denying acceptance of responsibility points and holding "that a defendant's attempt to smuggle drugs into a detention center after pleading guilty to a drug-related offense can serve as a sufficient basis for a District Court to deny a sentence reduction for acceptance of responsibility"); United States v. Olvera, 954 F.2d 788, 793 (2d Cir. 1992) (district court did not commit error in determining "smuggling of marijuana into prison indicated that [the defendant] had not withdrawn from criminal conduct and was inconsistent with acceptance of responsibility"); see also United States v. Foley, 71 F. App'x 889, 891 (2d Cir. 2003) (affirming district court denying acceptance of responsibility when defendant, after having pleaded guilty, assaulted a guard, escaped from prison, and committed a series of crimes before being recaptured); United States v. Prince, 204 F.3d 1021, 1024 (10th Cir. 2000) (district court did not commit clear error by denying acceptance of responsibility to defendant who stabbed another inmate while awaiting sentencing); United States v. McDonald, 22 F.3d 139, 144 (7th Cir. 1994) (district court did not err in denying acceptance of responsibility where defendant tested positive for narcotics while on pretrial release and failed to submit to certain drug testing).

III. <u>Analysis</u>

The government submits that a sentence of 37 months' imprisonment for the bribery offense, and 8 months' imprisonment for the contraband smuggling offense, is sufficient but not greater than necessary to achieve the goals of sentencing.

A. <u>The Guidelines Do Not Adequately Account for the Defendant's Crimes</u>

As an initial matter, the government submits that the Guidelines do not adequately account for the defendant's criminal conduct. First, because the adjusted offense

8

level for the bribery offense outweighs the offense level for the contraband smuggling offense, the defendant's commission of the contraband smuggling offense while on pretrial release results in no change to the defendant's range of imprisonment. This serious criminal conduct and breach of the Court's trust should result in additional punishment by imposition of a sentence at the high end of the Guidelines range. See Commentary to Section 3D1.4 ("If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense. Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines.").

    Second, although the defendant should receive a two-point reduction in her bribery case for being a "zero-point offender," this reduction does not adequately account for the unique circumstances of this case because the defendant has now committed a second crime. The zero-point offender amendment was implemented because "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points ("zero-point" offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." Amendments to the Sentencing Guidelines (Preliminary Version), U.S. Sentencing Commission, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf. Thus, although she is technically a zero-point offender with respect to at least the bribery case, the Court should consider that the defendant has demonstrated that she is already a recidivist and that her Guidelines range without the zero-point offender reduction would have been 41 to 51 months' imprisonment.

    Third, the Guidelines do not reflect the fact that the defendant committed a sex offense as a correction officer. The evidence shows that the defendant committed a felony sexual assault when she had a sexual relationship with Hinds while Hinds was an inmate on Rikers Island.[8] Although the defendant now attempts to categorize this relationship as a "romantic" one, it was also sexual and illegal. On October 17, 2021, Hinds said to the defendant on a recorded phone call while he was still incarcerated on Rikers Island, "I know how your p***y felt when I last had sex with you and all that." Of course, any relationship with an inmate, especially a romantic one, violates DOC policies as it places other inmates and correction officers at risk when a correction officer has a loyalty to a particular inmate and does not enforce the rules evenly as to all incarcerated individuals (as the defendant did

---

[8] See N.Y. Penal Law 130.05(3)(f) ("A person is deemed incapable of consent when he or she is . . . committed to the care and custody of a local correctional facility . . . and the actor is an employee, not married to such person, who knows or reasonably should know that such person is committed to the care and custody of such facility.").

here when she permitted Hinds certain privileges, see PSR ¶ 19). But inmates are incapable of sexual consent – even if there appears at first glance to be a romantic component – because correction officers are exploiting a power imbalance and inmates are not free to leave. This power imbalance is evidenced by the fact that it was the defendant, and not Hinds, who had the ability to bring in the contraband, to facilitate the payments, and to ensure the scheme was a success. Accordingly, the defendant's sexual and romantic relationship was not merely a violation of DOC policy; she committed a separate and serious felony sexual assault during her commission of the bribery offense, and thus, a significant term of incarceration is warranted.

Although the government does not seek an upward departure or variance outside the applicable Guidelines range, the government submits that these factors demonstrate that the Guidelines do not adequately account for the defendant's conduct and a below Guidelines sentence is not warranted.

### B. A Substantial Sentence of Incarceration is Warranted

A substantial sentence of incarceration is also necessary to reflect the seriousness of the defendant's conduct. As to the bribery scheme, the defendant not only smuggled at least two contraband cell phones into Rikers Island but was also a crucial member of Hinds' contraband ring because she received and facilitated the payments. As part of this scheme, Hinds, with the assistance of the defendant, distributed narcotics within Rikers Island. Contraband smuggling schemes, such as the one the defendant participated in, threaten the safety and integrity of jails. Indeed, authorities at Rikers Island have recently been forced to confront a number of inmate deaths due to drug overdoses. See, e.g., "Tracking the Deaths in New York City's Jail System," N.Y. Times, Jan Ransom and Jonah E. Bromwich (Feb. 4, 2023), available at https://www.nytimes.com/article/rikers-deaths-jail.html (stating that 20 people died on Rikers Island in 2022, including several of drug overdoses or suspected overdoses); "NY1 Investigation: Fatal drug overdoses rise on Rikers Island," NY1, Courtney Gross (Oct. 6, 2022), available at https://www.ny1.com/nyc/all-boroughs/public-safety/2022/10/06/ny1-investigation--fatal-drug-overdoses-rise-on-rikers-island.

The defendant's claim that the contraband cell phones were "brought in [for] someone I was in love with to communicate with," (Ex. A to Def's First Sentencing Mem) is false. Not only do individuals incarcerated at Rikers Island have daily access to recorded phone lines (as evidenced by Hinds and the defendant using those same phone lines to coordinate the contraband business and discuss their personal relationship) but, in 2019, New York City made these phone calls available to inmates free of charge. Contraband cell phones are extremely valuable items within a jail because they allow incarcerated individuals to make telephone calls without being monitored by the DOC, including about gang activities. Cell phones also allow incarcerated individuals to send text messages and use the Internet, including looking up information on other inmates' criminal cases. Without a

10

meaningful and substantial penal consequence for the defendant, there is limited incentive for correction officers to stop this common and illegal conduct of smuggling contraband.

Second, even though the defendant only engaged in this bribery scheme for two months, she ceased this activity only because she was caught by investigators, suspended, and placed on modified duty, thus rendering her useless to Hinds and his co-conspirators. There is no indication that the defendant would have stopped if she had not been caught; in fact, even after her suspension, the defendant continued to communicate with Hinds (a Bloods gang member) in violation of DOC policies, facilitated bail for him, and continue to assist in Hinds' schemes once he was released.

After having pleaded guilty before this Court for receiving bribes in exchange for smuggling contraband into Rikers Island, the defendant conspired with Hinds and others to smuggle contraband into the MDC. When she committed this crime, she also violated the terms of her bond and the trust the Court placed in her to abide by that bond while on release. Not only is contraband smuggling into the MDC a serious crime which can cause dangerous conditions at the jail, these actions show that the defendant has no respect for the law and that a significant sentence is needed to deter her from further criminal conduct.

A substantial term of imprisonment should also be imposed to provide for general deterrence. Unfortunately, the receipt of bribes by correction officers happens far too frequently. The Court should send a message to other correction officers, responsible for the safety of inmates and their colleagues, that the consequences of bribery will be significant, including a possible term of imprisonment.

The government recognizes the defendant's difficult life circumstances, particularly the murder of her fiancée in 2018 and that she is now a single mother due to his unfortunate death. The government agrees that this may be considered by the Court in determining an appropriate sentence. But the defendant's conduct was not aberrational, or a "moment of weakness." Ex. A to Def's First Sentencing Mem. She chose, again and again, to violate her oath as a correction officer to smuggle contraband into Rikers Island, to facilitate a contraband smuggling ring for a gang member, and to continue to commit crimes even while she was on pretrial release. And, for the reasons set forth above, the defendant's Guidelines range already vastly underrepresents her true criminal culpability. Thus, only a significant sentence of incarceration will satisfy all the Section 3553(a) factors, including imposing just punishment for this offense and providing both specific and general deterrence.

IV.     Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 37 months' imprisonment in 22-CR-195 and 8 months' imprisonment in 23-CR-207, to run consecutively.

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney

               By:     /s/ Philip Pilmar
                              Philip Pilmar
                              Assistant U.S. Attorney
                              718-254-6106

cc:     Clerk of the Court (KAM) (by ECF)
       Kelley Sharkey, Esq. (by ECF)
       Darren Galerkin, United States Probation Officer (by E-mail)